# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| CHEMENCE, INC., AND | : | |
| CHEMENCE MEDICAL PRODUCTS, | : | |
| INC. | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **CIVIL ACTION FILE NO.** |
| | : | _____ |
| JAMES QUINN, CARLOS MORALES, | : | |
| SAPHEON, INC. a.k.a. SAPHEON | : | |
| THERAPEUTICS, INC., DONALD | : | **DEMAND FOR JURY** |
| CRAWFORD and JOHN DOES | : | **TRIAL** |
| | : | |
| **Defendants.** | : | |

## COMPLAINT

Plaintiffs Chemence, Inc. ("Chemence") and Chemence Medical Products, Inc. ("CMPI"), hereby file their Complaint for violations of the Federal and State Racketeer Influenced and Corrupt Organizations Acts ("RICO"), conspiracy, misappropriation of trade secrets, fraud, tortious interference, conversion, breach of contract, unfair competition and patent invalidation.

## I. NATURE OF THE ACTION

1.

This action arises out of a scheme of industrial espionage by Defendants to

1

steal domestic trade secrets and use them domestically and abroad.

2.

Since at least February 2009, the operations of Chemence and CMPI in Alpharetta, Georgia, have been the target and victim of industrial espionage committed by one of its consultants, James Quinn ("Quinn") and one of its employees, Carlos Morales ("Morales") in concert and conspiracy with Donald Crawford ("Crawford"), his company Sapheon, Inc. a.k.a. Sapheon Therapeutics, Inc. ("Sapheon") and others.

3.

As more fully described below, Morales and Quinn have provided Plaintiffs' trade secrets to Sapheon and Crawford in exchange for compensation, the exact amounts are unknown until after discovery has been completed.

4.

Plaintiffs now bring this complaint to seek money damages for Defendants' theft and conversion and preliminary and permanent injunctive relief against the continuing possession and use of its trade secrets by Defendants.

II.     JURISDICTION AND VENUE

5.

2

Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; and principles of state common and statutory law as set forth below.

6.

This Court has personal jurisdiction over the Defendants pursuant to the Georgia Long-Arm Statute O.C.G.A. § 9-10-91.

7.

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 18 U.S.C. § 1964(c); and principles of supplemental jurisdiction.

8.

Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 18 U.S.C. § 1965(a). The claims alleged herein arose in this District; many acts and transactions that were part of the unlawful conspiracy and the fraudulent scheme alleged herein occurred in this District; venue is proper as to certain of the co-conspirator Defendants and, therefore, proper as to all; and the ends of justice require that parties residing in other districts be brought before this Court.

III.    THE PARTIES

9.

A.        Chemence, Inc.

3

Plaintiff Chemence is a corporation organized and existing under the laws of the state of Ohio with its principal place of business at 185 Bluegrass Valley Parkway, Alpharetta, Georgia 30005.

10.

Chemence is and at all relevant times has been engaged in the business of researching, developing, manufacturing, marketing and selling specialty performance chemical products on a worldwide basis, including cyanoacrylates ("CA"), which are also known as superglues and much of the technology it uses is proprietary or trade secret.

11.

Through years of great effort and expense, Chemence has developed formulas for CA, plant specifications and processes to manufacture CA that are trade secrets of the company, which gives it a competitive advantage.

12.

B.        Chemence Medical Products, Inc.

Plaintiff CMPI is a corporation organized and existing under the laws of the state of Ohio with its principal place of business at 185 Bluegrass Valley Parkway, Suite 100, Alpharetta, Georgia 30005 and is an affiliate to Chemence.

13.

4

CMPI is and at all relevant times has been engaged in the business of researching, developing, manufacturing, marketing CA in the medical field and much of the technology it uses is proprietary or trade secret.

14.

Through years of great effort and expense, CMPI has developed formulas, plant specifications and processes to manufacture medical CA that are trade secrets of the company, which gives it a competitive advantage.

15.

Chemence and CMPI have shared and used each other's resources and property, including facilities, employees and Intellectual Property.

16.

C.       James Quinn.

Defendant Quinn is a resident and citizen of the state of California, who is a medical doctor that has worked with and consulted for businesses in the medial CA field.

17.

Quinn performed certain consulting services for CMPI in the field of medical adhesive technology from on or about January 31, 2004 until his resignation April 14, 2011, but he had no history or experience with the process of

manufacturing CA prior to his engagement by CMPI as a consultant.

18.

Quinn was engaged by CMPI as a consultant in Alpharetta, Georgia and performed a significant amount of his consulting services that are the subject matter of this Complaint thereat.

19.

D.    Carlos Morales.

Defendant Morales is a resident and citizen of the state of Georgia, who attended Universidad de Costa Rica, San Jose, Costa Rica and received Master of Science in Medical Microbiology and Clinical Chemistry, along with being certified in Histology and Histopathology.  Morales has a long work history in CA research and development activities.

20.

Morales had been an employee of Chemence or CMPI from on or about October 29, 1997 through January 14, 2011 working in Alpharetta, Georgia.

21.

Since October 1997 through January 14, 2011, Morales has been employed with either Chemence or CMPI as a Cyanoacrylate Research Manager, providing chemical expertise in CA research, development and manufacturing, which

includes specifications, regulations and chemical formulas and processes in producing products and providing services for Plaintiffs.

22.

E.    Sapheon, Inc.

Defendant Sapheon, Inc. a.k.a. Sapheon Therapeutics, Inc. is a corporation organized and existing under the laws of the state of California with its principal place of business at 3579 Westwind Boulevard, Santa Rosa, California 95403.

23.

Prior to dealings with Quinn and Morales from on or about 2008 through April 2011, Sapheon did not manufacture CA or superglues in any form whatsoever. With the aid of stolen technology and processes from Chemence and CMPI, it is believed Sapheon started manufacturing CA on or about May 2011 and currently manufactures and sells products under the trade name Sapheon Closure system or otherwise that has received a CE (Conformité Européene" meaning "European Conformity") mark on or about September 2011, which includes medical CA for the treatment of varicose veins caused by venous reflux disease.

24.

Sapheon by and through its employees and agents came to Plaintiffs'
business premises in Alpharetta, Georgia to transact business and Plaintiffs' causes
of action arise from and are connected with such transactions.

25.

F.      Donald Crawford.

Defendant Crawford is believed to be a resident and citizen of the state of
Georgia, who is an owner, officer, director and/or person in charge and control of
Sapheon.

26.

G.      John Does.

Defendants John Does are individuals and/or entities that are liable to
Plaintiff for causing damages as alleged herein below, but are presently unknown
to Plaintiff.  This includes employees, officers, directors, shareholders and agents
of Sapheon and others, some of whom knew of the illegal conduct of the
Defendants, and some of whom carried out the Defendants' illegal activities under
the supervision and direction of others.

27.

IV.  FACTS

A.      CA Manufacture.

8

CA manufacturing is a highly specialized, technical and concentrated industry with only approximately twelve other significant CA manufacturing entities in the world, which are not owned or controlled by or affiliated with Plaintiffs. CA manufacturing is dependent upon process engineering, chemistry and application of material science with a limited number of individuals having a high level of expertise in the field.

28.

CA manufacturing for medical devices approved by the U.S. Food and Drug Administration ("FDA") is even more specialized, technical and concentrated industry than normal CA manufacturing with only approximately three other FDA approved CA medical manufacturing entities in the world, which are not owned or controlled by or affiliated with Plaintiffs.

29.

CA is made from cyanoacetate as its primary raw material. Cyanoacetate is not manufactured in the United States and must be imported with Bills of Lading filed with U.S. Customs Service pursuant to law.

30.

The information regarding CA formulas, the manufacturing process of CA and certain components of the plant itself are highly protected and considered

9

confidential and proprietary trade secret of Plaintiffs, which have substantial value to Plaintiffs and other manufacturers intending to compete.

31.

A reason the formulas and process of manufacturing CA are kept trade secrets instead of applying for patents is that there is no way to know about and regulate others from clandestinely utilizing these formulas or methods. Product testing or reverse engineering is difficult or incapable of identifying all of the ingredients and processes used, which are indistinguishable from other processes. Further, it is especially difficult to keep watch over those in the Far East and others located outside of the U.S. where weak patent protection legislation and enforcement exists, who will then compete with Plaintiffs by avoiding substantial costs of research and development and importing lower priced products in the U.S. and selling abroad.

32.

Plaintiffs invest substantial amounts in research and development for their current and future products. The CA formulas and manufacturing process cost Plaintiffs many millions of dollars and numerous years to develop and perfect. The growth and profitability of Plaintiffs are tied to protecting their current Intellectual Property and the development of new proprietary products and

production processes.

B.        Trade Secret Protection.

33.

Plaintiffs expend substantial money and efforts to ensure that their
employees and independent contractors properly safeguard Plaintiffs' proprietary
technology and proprietary business information. These safeguards include: (a)
limited access to confidential information; (b) instructions to employees and
independent contractors of their obligations to maintain the confidentiality of the
matters they work on; (c) distribution of guidelines to employees and independent
contractors outlining their confidentiality obligations; (d) dissemination of written
policies on information security; (e) requiring employees, independent contractors
and certain customers to execute agreements containing non-disclosure and
confidentiality provisions; (f) reminding employees who terminate employment
with Plaintiff of continuing confidentiality obligations; and (g) providing written
notice to key employees who leave Plaintiffs as well as their new employers of
Plaintiffs' expectations that their confidential information will not be disclosed or
used. Plaintiffs also have locks on their doors, utilize hidden cameras, restrict
access to their laboratories and manufacturing plants, and have an alarm system
along with other security measures. Visitors must be accompanied by an employee

of Plaintiffs, and are not allowed into sensitive areas.

34.

Every person associated with CA formulations and the manufacturing processes are and were required to sign agreements with confidentiality provisions. Also, access to CA manufacturing process and formula information are restricted to those on a need to know basis, which consists of only a few individuals, with the information also encrypted password protected.

35.

Until the conduct set forth in this Complaint, Plaintiffs' procedures and policies for protecting their intellectual property have been successful.   Defendants were able to carry out their conspiratorial scheme despite Plaintiffs' safeguards, principally because of the extreme care and secrecy with which they conducted their misappropriation activities and Morales' position as Cyanoacrylate Research Manager and Quinn's position as consultant with wide-ranging responsibilities and access to company information.  Morales was one of only a few select Chemence and CMPI employees that had access to the entire data base of CA formulations. Once alerted to the potential of illegal activity, Plaintiffs responded immediately and aggressively to protect their proprietary technology and confidential business information.

36.

Pursuant to Plaintiffs' policies of guarding their proprietary information, Morales and Quinn signed agreements at the commencement of their employment or engagement with Plaintiffs, in which they promised to safeguard information that they obtained during their employment or engagement and to keep it confidential.

37.

Pursuant to Plaintiffs' policies of guarding their proprietary information, Sapheon signed a Mutual Confidential Disclosure Agreement prior to the exchange of confidential information with CMPI and a Co-Development Agreement thereafter that also contained provisions for confidentiality.

C.        <u>Agreements with Defendants.</u>

38.

On or about October 29, 1997, Morales entered into an Employment, Non-Disclosure and Non-Solicitation Agreement ("Employment Agreement") with Chemence, which among other things prohibited the disclosure to any other person, firm, association, corporation or other legal entity, during or subsequent to his employment with Chemence, any Trade Secrets in the possession or control of Chemence, and will not, for the benefit of Morales or others, use, modify, or adapt

13

any Trade Secrets of Chemence without first obtaining the written consent of

Chemence.

39.

Further, Morales' Employment Agreement had provisions that any

improvements, inventions, ideas, conceptions or trade secrets made by him either

solely or jointly and relating to the business of Chemence shall be promptly

disclosed to Chemence by Morales and shall be and remain the sole and exclusive

property of Chemence.

40.

On or about January 31, 2004, Quinn entered into Consulting Agreement

with CMPI in order to act as a consultant, which contained provisions for

confidentiality including that Quinn:

> "agrees that Consultant will not, except in the course of his Services
> for Chemence, disclose any Confidential Information concerning
> Chemence.  As used in this Agreement, "Confidential Information"
> includes, without limitation, project plans, specifications, formulas,
> drawings, programs, technology,  processes, customer information,
> supplier information, employee information, sub-contractor
> information, product information, sales reports, financial information,
> price information or documents concerning the business or prospects
> of Chemence not otherwise available to the general public.  Upon the
> expiration or earlier termination of this Agreement, Consultant shall
> immediately return to Chemence all documents containing
> Confidential Information, including, but not limited to, any
> duplications, reproductions or summaries thereof.  The provisions of

14

this paragraph are in addition to any obligations for confidentiality existing as part of any prior agreement or relationship between the parties, and shall survive the termination of this Agreement."

41.

Further, Quinn's Consulting Agreement had provisions that all Work Product created solely or jointly by Quinn, arising from Services performed hereunder shall be deemed "work made for hire" and Quinn shall execute all such assignments, oaths, declarations, and other documents as may be prepared by CMPI to effect the foregoing.

42.

On or about July 8, 2008, Sapheon entered a Mutual Confidential Disclosure Agreement with CMPI that restricted the use of the others confidential information solely to explore the possibility of entering into a business transaction between CMPI and Sapheon, which included protections for such confidential information.

43.

On or about January 30, 2009 Sapheon entered a Co-Development Agreement with CMPI, which was signed by Crawford on behalf of Sapheon and had provisions for maintaining confidentiality of information including that "both parties shall treat the Confidential Information received from the other party as

proprietary or confidential and shall not disclose any such Confidential

Information to any third party during the Term and for a period of twenty (20)

years thereafter . . ."

44.

Further, the Co-Development Agreement had provisions for

"inventions, discoveries or ideas made solely by employees of Chemence as a

result of work done under the Co-Development Program (Chemence "Sole

Inventions") shall remain the property of Chemence."

45.

Further, the Co-Development Agreement had provisions for patents giving

Sapheon the first option, at its sole expense, to draft and file any patent

applications related to a Joint Invention by expressing its intent in writing to

CMPI. Prior to filing, any patent application prepared by Sapheon for Joint

Inventions shall be sent to CMPI for review, consent and approval.

D.        Defendants' Scheme.

46.

Morales was the technical employee dedicated by CMPI to the Sapheon Co-

Development Agreement.

47.

Quinn was the medical consultant dedicated by CMPI to the Sapheon Co-Development Agreement and was the person who initiated and negotiated the deal on behalf of CMPI.

48.

As compensation for consulting services, Quinn was paid $4,000 per month plus his expenses by CMPI until his resignation on or about April 14, 2011 totaling $382,246.

49.

Beginning on or about October 28, 2008, Quinn provided consulting services to Sapheon that included engineering and research and development to provide clinical feedback and insight on present and future products; participation in clinic trials and papers; and attendance at Management Advisory Board meetings, which led to entering a formal Medical Advisory Board Agreement with Sapheon thereafter, with a term of October 28, 2008 through December 31, 2012, whereby Quinn was to receive $2,250.00 per year for services rendered.

50.

CMPI was not notified of the terms of Quinn's Medical Advisory Board Agreement with Sapheon, which was a conflict of interest for Quinn regarding his duties for CMPI.

17

51.

Quinn was paid by CMPI from October 2008 through April 2011 in the total amount of $122,971.84, consisting of $120,000.00 for consulting fees and $2,971.84 for expenses.

52.

Quinn was negotiating the terms of an Equity Agreement with Sapheon while he was negotiating on behalf of CMPI the terms for the Co-Development Agreement, which was not disclosed to CMPI.

53.

Unbeknownst to Plaintiffs, on or about January 2009, but while still a paid consultant of CMPI, Quinn entered an Equity Agreement with Sapheon and became a shareholder of Sapheon owning 537,313.4328 shares, which was a conflict of interest for Quinn regarding his duties for CMPI.

54.

Quinn, Crawford and others attended a Sapheon Medical Advisory Board Meeting on or about February 18, 2009 to determine matters regarding the "Sapheon project," and generated minutes including:

> What is the 'best' glue to use for the procedure?
> If 'best' means the quickest and least expensive path to a
> marketable product, then it needs to be determined if a new CA

product (i.e. some formulation of PPCA) is more advantageous, or whether medical glues already approved by the FDA (bioglue, coseal, butyl CA) meet our needs.  Are 'bioglue,' 'coseal,' or butyl CA effective enough for the initial product launch?  These glues are commercially available and can be tested immediately.

Even with an already approve glue, the FDA will most likely make Sapheon redo all testing from scratch because this will be a new use for the glue.  Then, when Sapheon switches to a better glue (new CA formulation), all testing will need to be repeated with the new glue. Therefore, if Sapheon wants to eventually use a CA formulation for the glue, testing will need to be done twice, thus adding an expense that may not be off-set by the initial use of a glue already approved by the FDA.

The regulatory path for a new CA formulation will more than likely be more expensive to get approved, then using a glue already approved by the FDA. However, the already approved glues most likely will not exhibit the properties that Sapheon desires in a glue, i.e. strength and rapid degradability.  Therefore, in the long term, a CA formulation might prove to be the "best" product for the Sapheon procedure, especially if it can be shown to 'disappear' from the body after sixty days.

Agreements should be made with companies that have a medical glue product(s) that is already approved by the FDA. Such agreements would provide Sapheon with an alternate source of glue if needed, and also protect Sapheon in the case that these companies attempt to use their glue in conjunction with a procedure similar to Sapheon's.

For marketing purposes, PPCA is the better story.

55.

At the time of the Sapheon Medical Advisory Board Meeting on or about

February 18, 2009, according to the terms of the Co-Development Agreement,

CMPI and Sapheon desired to enter into a future supply agreement which will set

19

out the terms and conditions under which CMPI will <u>exclusively supply to Sapheon all of its requirements of formulated, cyanoacrylate adhesive.</u>   However, Quinn, Crawford, Sapheon and others were plotting against CMPI to find alternate means to obtain CA, while Quinn was a paid consultant for CMPI whose duties included increasing sales for CMPI.

56.

CMPI has CA formulations approved by the FDA as Class I and Class II medical devices.

57.

Prior to performing any work for Sapheon, Plaintiffs have researched and developed formulations for propoxypropyl CA ("PPCA") and other CA for medical use, which have biodegradable properties, with Morales being the primary employee and Quinn being the primary consultant performing such work.

58.

According to the terms of the Co-Development Agreement "Time is of the essence for all deadlines" and within twenty 21 days of execution Sapheon was obligated to pay CMPI an initial $50,000.00 payment by February 20, 2009, which was actually paid late around March 10, 2009, delaying the start of the project and exchange of information.  Development work was not to begin by CMPI until this

20

payment was received according to an email from Crawford on January 20, 2009.

59.

Prior to CMPI receiving its initial payment and unknown to CMPI, Quinn sent CA formulations to Crawford and Sapheon. In particular, Quinn sent Crawford an email on February 20, 2009 whereby he states:

> "We don't have all the CA formulations especially if we want to try the NBCA. I got you some PPCA formulations under the table. Let me know when Chemence has been paid the amount to execute the deal and I will get the NBCA formulations."

60.

Various e-mails, correspondence, telephone calls and other communications between Quinn, Morales, Crawford and others on behalf of Sapheon, discussed formulas and processes for CA that were trade secrets of Plaintiffs.

61.

According to the terms of the Co-Development Agreement, Sapheon was granted an option to for an exclusive worldwide, perpetual, transferable, irrevocable royalty-free license of all applicable Intellectual Property associated with Products in the Field in consideration for negotiating an exclusive Supply Agreement with CMPI having a minimum term of five years with other standard terms for such an agreement, including a price per one cc unit for the cyanoacrylate

component and packaging not to exceed Fifty Dollars ($50.00), plus cost plus

Twenty Five Percent (25%) of the cost for any additional components to the

formulation agreed to in the final Product Specifications.  Should Sapheon decide

to exercise this option of exclusivity for Products in the Field, royalty rates and

other commercial terms will be negotiated in good faith between Sapheon and

CMPI at that time.

62.

Morales employment with CMPI ended on January 14, 2011 and he signed a

Termination and Release Agreement with Plaintiffs on said date that included

provisions for a period of two (2) years after termination, not to directly or

indirectly, either individually or as a partner, owner, officer, shareholder or

employee of any other firm, entity or organization, solicit, contact, call upon,

communicate with or attempt to communicate with any customer of Plaintiffs with

whom Morales had material contact during the two year period immediately

preceding the date of termination of employment, with a view to selling,

marketing, developing or providing any products or services substantially similar

to those products or services developed, manufactured, sold or marketed by

Plaintiffs within the two year period immediately preceding the termination of

employment which Morales worked, developed, learned about or to which Morales

22

was exposed that are competitive with those provided by Plaintiffs. Further, Morales agreed for a period of two (2) years after termination not to work in the medical cyanoacrylate field (for human and animal use) in regard to topical wound closure and sealing, intra-vascular or extra-vascular applications and coating or sealing of pressure ulcers.

63.

Morales had a certified letter sent to Chemence dated January 21, 2011 revoking and rescinding the Termination and Release Agreement with Plaintiffs.

64.

Based upon knowledge, information and belief, Quinn, Crawford and others on behalf of Sapheon interfered with and persuaded Morales to revoke and rescind the Termination and Release Agreement with Plaintiffs.

65.

Shortly thereafter, Morales was employed and/or engaged by Sapheon to research and develop CA for its products.

66.

The Co-Development Agreement specifically prohibited Sapheon for a period of two (2) years beyond termination from soliciting or recruiting any employees or independent contractors of the other company who have worked on

23

or performed technical services regarding the Products without the prior written consent of the other, but Sapheon may engage Quinn in a management advisory role, so long as it does not conflict with his duties for Chemence.

67.

Quinn sent Chemence a letter of resignation via email dated April 14, 2011 stating in part "it is probably best that we not enter into a new consulting agreement."

68.

Crawford sent CMPI a letter dated May 18, 2011 stating in part that "Sapheon hereby informs Chemence of its decision not to exercise its option pursuant to Section 5.5" of the Co-Development Agreement, effectively terminating the Co-Development Program, the option for an exclusive worldwide, perpetual, transferable, irrevocable royalty-free license of all applicable Intellectual Property associated with Products in the Field to Sapheon and contemplated Supply Agreement.

70.

On or about May 19, 2011, a shipment of N-Butyl Cyanoacetate (used for making medical CA) from the Peoples Republic of China arrived in Los Angeles, California for Sapheon, which is the same or similar CA product CMPI was

24

providing Sapheon for testing and evaluation pursuant to the Co-Development Agreement.

71.

Sapheon imported cyanoacetate to manufacture CA using Plaintiffs technology, former employee and former consultant.

72.

Sapheon was once a customer of CMPI with the expectation of entering into a long term supply agreement and now is a competitor and/or a potential competitor of Plaintiffs.

73.

Defendants' theft and use of Plaintiffs trade secret information has unjustly enriched Defendants and harmed Plaintiff.

74.

As a result of Defendants' theft of the Plaintiffs' intellectual property, Sapheon transformed itself from a CA technologically primitive company to a company with modern, and in some cases, state of the art technology. It has unlawfully acquired CA formulations, plant specifications and the ability to manufacture CA thereby improving products, increasing the manufacturing yields of its products and reducing its facility, supply and manufacturing costs. While it

gained substantial unjust enrichment on a theft-by-theft, product-by-product basis, the cumulative effect was even greater. Its illegal conduct allowed Sapheon to transform itself from a mere customer of CMPI, to one that is now positioned through extensive thefts of Plaintiffs' trade secrets to become a significant manufacturer in the global market for medical CA adhesives without the time constraints or burden of millions of dollars worth of research and development costs.

75.

Plaintiffs, by contrast, have suffered substantial damages in lost sales to Sapheon and in markets in which it competes with Sapheon. Unless injunctive relief is granted, those damages will continue and grow as Sapheon and Plaintiffs enter increasingly into head-to-head competition in emerging European and Asian markets and as products are sold in the U.S. after FDA approval.

**<ins>COUNT I</ins>**
**(Racketeer Influenced And Corrupt Organizations Act**
**18 U.S.C. Sections 1962(c) and 1964(c))**
**(Against All Defendants)**

76.

Plaintiff incorporates herein by reference paragraphs 1 through 75 as if fully restated herein.

26

77.

From on or about October 2008, continuing through the filing of this Complaint, in the Northern District of Georgia and elsewhere, Defendants were persons employed by and associated-in-fact with an enterprise engaging in, and the activities of which affect, interstate and foreign commerce. This enterprise is made up of the Quinn, Morales, Sapheon, Crawford and John Does.

78.

Defendants, for the purpose of executing and attempting to execute the scheme to defraud Plaintiffs and steal their trade secret information, by means of false representations, conversions and concealment, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of said enterprise's affairs through a pattern of racketeering activity. Their actions include acts of: (1) Mail Fraud, 18 U.S.C. § 1341; (2) Wire Fraud, 18 U.S.C. § 1343; (3) Transportation of Stolen Goods, 18 U.S.C. § 2314 and (4) Receipt of Stolen Goods, 18 U.S.C. § 2315, respectively.

79.

The enterprise as described herein is at all relevant times a continuing enterprise because, among obvious reasons, it is designed to and did unlawfully acquire the confidential trade secrets of Plaintiffs and incorporate them into the

ongoing business, marketing strategies and product plans of Sapheon. The conduct of the enterprise continues through the date of this Complaint and is ongoing by virtue of Defendants' continued use of Plaintiffs highly confidential, proprietary and trade secret information, all to Plaintiffs' detriment.

80.

The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat of continuing criminal activity. Such activity consists of multiple acts of racketeering by each Defendant, is interrelated, not isolated, and is perpetrated for the same or similar purposes by the same persons. Such activity extends over a substantial period of time of over two years, up to and beyond the date of this Complaint. Such activities occurred after the effective date of 18 U.S.C. §§ 1961 et seq., and the last such act occurred within 10 years after the commission of a prior act of racketeering activity. These racketeering activities included repeated acts of:

(a)   Mail Fraud: On or about the dates indicated in the paragraphs herein above, Defendants, aided and abetted by each other, having devised a scheme or artifice to defraud Plaintiffs of their confidential trade secret information by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such scheme or artifice to defraud,

28

transmit and cause to be transmitted by means of mail communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2.

(b)  Wire Fraud. On or about the dates indicated in the paragraphs herein above, Defendants aided and abetted by each other, having devised a scheme or artifice to defraud Plaintiffs of their confidential trade secret information by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2.

(c)  Interstate or Foreign Transportation of Stolen Goods: On or about the dates indicated in the paragraphs herein above, Defendants aided and abetted by each other, having devised or intending to devise a scheme or artifice to defraud plaintiff of their confidential, proprietary information by means of false or fraudulent pretenses, representations or promises, transported or caused to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud, confidential, proprietary property or information of Plaintiffs, having a value of $5,000 or more, in violation of 18 U.S.C. § 2314 and 18

29

U.S.C. § 2.

    (d)    <u>Receipt of Stolen Goods:</u> On or about the dates indicated in the paragraphs herein above, Defendants aided and abetted by each other, did receive, possess, conceal, store or dispose of goods of the Plaintiff, which had crossed a State or United States boundary after being stolen, unlawfully converted or taken, knowing the same to have been stolen, unlawfully converted, or taken. Such goods include confidential, proprietary information, having a value of $5,000 or more. Such actions are in violation of 18 U.S.C. § 2315 and 18 U.S.C. § 2.

81.

Sapheon had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf. Sapheon also attempted to benefit, and did benefit, from the activity of its employees and agents alleged herein, and thus was not a passive victim of racketeering activity, but an active perpetrator. Sapheon also knew that Quinn and Morales intended to and did breach their duties to Plaintiffs and aided and abetted these violations by giving them substantial assistance and encouragement to perform the breaches of duties alleged herein, including cash payments and offers to induce them to do so.

82.

Plaintiffs have been injured in their business or property by reason of

Defendants' violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering injury.

83.

As a result of the violations of 18 U.S.C. § 1962(c) by Defendants, Plaintiff has suffered substantial damages, in an amount to be proven at trial.

84.

Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble their general and special compensatory damages, plus interest, costs and attorneys' fees, by reason of Defendants' violations of 18 U.S.C. § 1962(c).

## COUNT II
**(Conspiracy To Violate Racketeer Influenced And Corrupt Organizations Act 18 U.S.C. Sections 1962(d) and 1964(c))**
**(Against All Defendants)**

85.

Plaintiffs incorporate herein by reference paragraphs 1 through 84 as if fully restated herein.

86.

Incorporating all prior allegations, from on or about October 2008, and continuing through the time of filing this Complaint, in the Northern District of Georgia and elsewhere, Defendants knowingly and unlawfully, did conspire,

combine, confederate and agree together, and with various other persons whose names are both known and unknown, to violate 18 U.S.C. § 1962©.

87.

These Defendants were and are employed by and associated-in-fact with an enterprise engaged in, and the activities of which affect, interstate and foreign commerce. Specifically, Quinn, Morales and Crawford, constituting a group of individuals associated-in-fact, did unlawfully, willfully and knowingly participate in and conduct, directly and indirectly, said enterprise's affairs through a pattern of racketeering activity.

88.

The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5) included:

   (a) Acts of Mail Fraud, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2, as described in this Complaint;

   (b) Acts of Wire Fraud, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as described in this Complaint;

   (c) Acts of Interstate and Foreign Transportation of Stolen Goods, in violation of 18 U.S.C. § 2314 and 18 U.S.C. § 2, as described in this Complaint; and

(d)    Acts of Receiving Stolen Goods, in violation of 18 U.S.C. § 2315 and 18 U.S.C. § 2, as described in this Complaint.

A.    The Conspiracy and Scheme to Steal Trade Secrets from Plaintiff

89.

Defendants schemed to defraud Plaintiffs and steal their trade secret information by means of false representations, breaches of fiduciary duty, conversion and concealment.

B.    Overt Acts

90.

In furtherance of this unlawful conspiracy, and to affect its objectives, Defendants and various co-conspirators committed numerous overt acts, including but not limited to those set forth herein.

C.    Damages and Statutory Violations

91.

Plaintiffs have been injured in their business or property by reasons of Defendants' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering injury.

92.

As a result of the conspiracies between and among all Defendants to violate

33

18 U.S.C. § 1962(c), Plaintiffs have suffered substantial damages, in an amount to be proven at trial.

93.

Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble their general and special compensatory damages, plus interest, costs and attorneys' fees, by reason of Defendants' violation of 18 U.S.C. § 1962(d).

## COUNT III
**(Georgia RICO Violations)**
**(Against All Defendants)**

94.

Plaintiffs incorporate herein by reference paragraphs 1 through 93 as if fully restated herein.

95.

Defendants violated the Georgia Racketeer Influenced & Corrupt Organizations Act ("RICO"), O.C.G.A. § 16-14-1, *et seq.*, specifically O.C.G.A. § 16-14-4(a), by engaging in a systematic and ongoing pattern of acts of theft and fraud of over two years.

96.

This theft and fraud were conducted for the purpose of converting Plaintiffs' confidential, proprietary and trade secret information and defrauding Plaintiffs.

Defendants engaged in an interrelated pattern of criminal activity, the motive and effect of which was to derive pecuniary gain.

97.

The pattern of racketeering activity committed by Defendants consists of a minimum of two separate and distinct incidents of racketeering activity as defined by O.C.G.A. § 16-14-3(9)(A).

98.

The pattern of racketeering activity committed by Defendants are interrelated by distinguishing characteristics and are not isolated incidents, having occurred many times over more than two years.

99.

The incidents of racketeering activity committed by Defendants had the same or similar intents, results, victims, and methods of commission. Specifically, they had the same intent and the same results in that they resulted in the conversion of Plaintiffs' confidential, proprietary and trade secret information.

100.

The referenced incidents of racketeering were engaged in by Quinn while he was acting in his capacity as an independent contractor for CMPI. The referenced incidents of racketeering were engaged in by Morales while he was employed by

Chemence and CMPI.

101.

Defendants accepted and retained the benefits of their racketeering activities.

102.

Plaintiffs are victims of Defendants' racketeering activities.

103.

All of Defendants' racketeering activities were committed after July 1, 1980 and the last incident of racketeering activity occurred within four years after the commission of a prior incident of racketeering activity. This action is brought within five years after the cause of action accrued pursuant to O.C.G.A. § 16-14-8.

104.

In the course of conducting their efforts to defraud Plaintiffs, Defendants engaged in multiple incidents of theft by taking in violation of O.C.G.A. § 16-8-2.

105.

In the course of conducting their efforts to defraud Plaintiffs, Defendants engaged in multiple incidents of theft by deception in violation of O.C.G.A. § 16-8-3.

106.

In the course of conducting their efforts to defraud Plaintiffs, Defendants

engaged in multiple acts of theft by conversion in violation of O.C.G.A. § 16-8-4.

107.

Theft by taking, theft by deception, and theft by conversion constitute "racketeering activity" pursuant to O.C.G.A. § 16-14-3(9)(A)(ix).

108.

Plaintiffs sustained damages as a result of Defendants' violations of O.C.G.A. § 16-14-4(a) in an amount to be proven at trial. Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs are entitled to recover three times their actual damages, as well as their attorney's fees and costs of investigation and litigation. Plaintiffs are also entitled to recover punitive damages because Defendants' conduct was willful, wanton, and evidenced that entire want of care as would raise a presumption of conscious indifference as to consequences. Defendants' conduct also evidences specific intent to cause harm to Plaintiffs.

## COUNT IV
### (Endeavor to Violate Georgia RICO)
### (Against All Defendants)

109.

Plaintiffs incorporate herein by reference paragraphs 1 through 108 as if fully restated herein.

110.

Defendants endeavored to violate O.C.G.A. § 16-14-4(a).

111.

Defendants' endeavor to violate O.C.G.A. § 16-14-4(a) caused injury to Plaintiffs.

112.

Defendants' endeavor to violate O.C.G.A. § 16-14-4(a) constitutes a violation of O.C.G.A. § 16-14-4(c).

113.

Plaintiffs have sustained damages as a result of Defendants' violation of O.C.G.A. § 16-14-4 in an amount to be proven at trial.

114.

Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs are entitled to recover three times their actual damages, as well as their attorney's fees and costs of the investigation and litigation.

115.

Plaintiffs are entitled to recover punitive damages because Defendants' conduct was willful, wanton, and evidenced that entire want of care as would raise a presumption of conscious indifference as to consequences. Defendants' conduct also evidences specific intent to cause harm to Plaintiffs.

## COUNT V
### (Conspiracy)
### (Against All Defendants)

#### 116.

Plaintiff incorporates herein by reference paragraphs 1 through 115 as if fully restated herein.

#### 117.

Defendants have conspired to misappropriate Plaintiffs' trade secrets, to defraud Plaintiffs, and to convert Plaintiffs' property, all in violation of Georgia law.

#### 118.

Defendants' theft and use of Plaintiffs' trade secret information has unjustly enriched Defendants and harmed Plaintiffs.

#### 119.

Plaintiffs suffered damages, and will imminently suffer further damages, including the loss of their proprietary information and competitive position, in an amount to be proven at trial.

## COUNT VI
### (Misappropriation Of Trade Secrets)
### (Against All Defendants)

#### 120

Plaintiffs incorporate herein by reference paragraphs 1 through 119 as if fully restated herein.

121.

Plaintiffs possessed trade secret information that Plaintiffs used in business and that gives them competitive advantages.

123.

Defendants are "persons" as defined in O.C.G.A. § 10-1-761(3).

124.

The information Quinn and Morales used to set up CA research, development and manufacturing for Sapheon and other information Quinn and Morales have taken from Plaintiffs constitute Plaintiffs' trade secrets under the Georgia Trade Secrets Act of 1996.

125.

Such information derives economic value, actual and potential, from not being generally known to, and not being ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use.

126.

Plaintiffs have expended substantial sums to develop CA formulations and CA manufacturing processes and to retain this confidential, proprietary, and trade

secret information.

127.

Quinn and Morales acquired knowledge of such trade secrets in confidence, and breached their duty of confidence by providing this information to Crawford and Sapheon. Defendants have used and are using Plaintiffs' trade secrets.

128.

Defendants individually and in combination have misappropriated Plaintiffs trade secrets in violation of the Georgia Trade Secrets Act.

129.

Plaintiffs' trade secrets acquired improperly by the Defendants are not readily ascertainable by proper means by persons who could benefit from their use and were subject of reasonable efforts to maintain their secrecy.

130.

Furthermore, the information and processes at issue are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

131.

Defendants' misappropriation and improper use of Plaintiffs' confidential information and trade secrets have caused Plaintiffs to suffer irreparable harm for which they have no adequate remedy.

41

132.

Pursuant to O.C.G.A. § 10-1-762, Defendants should be enjoined from further misappropriation and use of these trade secrets.

133.

Pursuant to O.C.G.A. § 10-1-763, damages should be awarded to Plaintiffs for this misappropriation and improper use. Willful and malicious misappropriation and use entitle Plaintiffs to exemplary damages and reasonable attorney's fees according to O.C.G.A. §§ 10-1-763 and 764.

134.

Plaintiffs have suffered damages and will imminently suffer further damages, including the loss of their proprietary information and competitive position, in an amount to be proven at trial.

## COUNT VI
### (Fraud)
### (Against Defendants Quinn, Crawford and Sapheon)

135.

Plaintiff incorporates herein by reference paragraphs 1 through 134 as if fully restated herein.

136.

Pursuant to Defendants' scheme, Quinn, Crawford and Sapheon intentionally

misrepresented their intent in acquiring Plaintiffs' proprietary information when entering into the Co-Development Agreement, and did so to deceive Plaintiffs into allowing Quinn continued access to such information all while being a paid consultant for CMPI.

137.

Quinn made material omissions which he was under a duty to reveal. Such omissions include:

- Failing to inform CMPI that Quinn provided consulting services to Sapheon commencing on or about October 28, 2008 involving CA;

- Failing to inform CMPI that Quinn entered a formal Medical Advisory Board Agreement with Sapheon;

- Failing to inform CMPI that Quinn was negotiating an "Equity Agreement" with Sapheon at the same time Quinn was allegedly representing CMPI's interests during contract negotiations for the Co-Development Agreement;

- Failing to inform CMPI that Quinn entered an Equity Agreement with Sapheon and became a shareholder of Sapheon owning 537,313.4328 shares;

- Failing to inform CMPI that Sapheon entered into the Co-Development Agreement with CMPI with the intent to steal Plaintiffs' trade secrets.

- Failing to inform CMPI that Quinn, Crawford and others attended a Sapheon

43

Medical Advisory Board Meeting on or about February 18, 2009 to

determine matters regarding the "Sapheon project" that were against the

interests of CMPI; and

- Failing to inform CMPI of Sapheon's theft of its trade secrets.

138.

Plaintiffs reasonably relied on these misrepresentations in allowing Quinn

such continued access along with Morales sending confidential information to

Crawford and Sapheon and was injured as a result of their reliance.

## <u>COUNT VII</u>
### (Tortious Interference with Business/Contractual Relations)
### (Against all Defendants)

139.

Plaintiffs incorporate herein by reference paragraphs 1 through 138 as if

fully restated herein.

140.

Sapheon has hired or engaged Morales and Quinn with full knowledge of the

confidentiality and non-solicitation restrictions imposed on both by the terms of the

Mutual Confidential Disclosure Agreement, Co-Development Agreement,

Employment Agreement and Consulting Agreement.

141.

Sapheon hired Morales and induced Morales to breach various provisions of Co-Development Agreement, Employment Agreement and Termination Agreement and violate trade secrets and unfair competition laws, and interfered with Plaintiffs' business relations by using and disclosing to Sapheon and/or others Plaintiffs' confidential, proprietary, and/or trade secret information.

142.

Sapheon's actions constitute intentional and improper interference with Plaintiffs' existing contractual relationship with Morales.

143.

Sapheon engaged Quinn and induced Quinn to breach various provisions of Co-Development Agreement and Consulting Agreement and violate trade secrets and unfair competition laws, and interfered with Plaintiffs' business relations by using and disclosing to Sapheon and/or others Plaintiffs' confidential, proprietary, and/or trade secret information.

144.

Sapheon's actions constitute intentional and improper interference with CMPI's existing contractual relationship with Quinn.

145.

Quinn induced Morales to breach various provisions of Co-Development

45

Agreement, Employment Agreement and Termination Agreement and violate trade secrets and unfair competition laws, and interfered with Plaintiffs' business relations by using and disclosing to Sapheon and/or others Plaintiffs' confidential, proprietary, and/or trade secret information.

146.

Quinn's actions constitute intentional and improper interference with Plaintiffs' existing contractual relationship with Morales.

147.

Quinn induced Sapheon to breach various provisions of Mutual Confidential Disclosure Agreement, Co-Development Agreement and Consulting Agreement and violate trade secrets and unfair competition laws, and interfered with Plaintiffs' business relations by using and disclosing to Sapheon and/or others Plaintiffs' confidential, proprietary, and/or trade secret information.

148.

Quinn's actions constitute intentional and improper interference with CMPI's existing contractual relationship with Sapheon.

149.

Morales  induced Sapheon to breach various provisions of  Mutual Confidential Disclosure Agreement, Co-Development Agreement and Consulting

Agreement and violate trade secrets and unfair competition laws, and interfered with Plaintiffs' business relations by using and disclosing to Sapheon and/or others Plaintiffs' confidential, proprietary, and/or trade secret information.

150.

Morales' actions constitute intentional and improper interference with CMPI's existing contractual relationship with Sapheon.

151.

None of the acts of Defendants described above were privileged or supported by any legitimate business purpose, and all such acts were designed with the purpose to harm and injure Plaintiffs and benefit Defendants.

152.

Defendants' actions were done willfully, maliciously, and with wanton and reckless disregard of the rights of others.

153.

As a result of Defendants' interference with the business/contractual relationships, Plaintiffs have been damaged in an amount yet to be determined.

## COUNT VIII
### (Conversion)
### (Against All Defendants)

154.

Plaintiff incorporates herein by reference paragraphs 1 through 153 as if fully restated herein.

155.

Each of the Defendants' wrongfully exerted dominion over property belonging to Plaintiffs in denial of and inconsistent with Plaintiffs' rights. Defendants dispossessed Plaintiffs of their property and used that property for their own benefit without the authority to do so.

156.

Defendants are in actual possession of Plaintiffs' property.

157.

Each of the Defendants has converted and appropriated for their own use the property of Plaintiffs. Plaintiffs have suffered a detriment, and Defendants have been unjustly enriched, from these acts of conversion, in an amount to be proven at trial.

158.

Defendants have acted with the specific intent to cause harm to Plaintiffs, thereby entitling Plaintiffs to punitive damages.

## **COUNT IX**

**(Breach of Contract)**
**(Against all Defendants)**

159.

Plaintiff incorporates herein by reference paragraphs 1 through 158 as if fully restated herein.

160.

Incorporating all prior allegations, Defendants have misappropriated, disclosed and used confidential information and trade secrets of Plaintiffs in violation of the terms of their Agreements and breach of their duty of loyalty and have utilized said confidential information and trade secrets to the detriment of the Plaintiffs.

161.

Sapheon has breached the Co-Development Agreement by soliciting, recruiting and hiring Morales within the period of two (2) years beyond termination without the prior written consent of the CMPI.

162.

Sapheon has breached the Co-Development Agreement by engaging Quinn in a management advisory role that does conflict with his duties for CMPI.

163.

Sapheon has breached the Co-Development Agreement by filing two patent application prepared by Sapheon for either Sole Inventions of Plaintiffs or Joint Inventions, which were not sent to CMPI for review, consent and approval.

164.

Morales has breached the non-competition provisions of his Employment Agreement.

165.

The breach of the terms of the Mutual Confidential Disclosure Agreement by Sapheon entitles Plaintiffs to damages as well as attorney fees, expenses of litigation and injunctive relief.

### COUNT X
### (Unfair Competition)
### (Against all Defendants)

166.

Plaintiffs incorporate herein by reference paragraphs 1 through 165 as if fully restated herein.

167.

During Morales' employment with Plaintiffs and Quinn's engagement as a consultant for CMPI, both have engaged in activities in the course and scope of their employment and engagement that directly involved research, development

and support of Plaintiffs' products and are in direct competition with Sapheon's products and/or potential new products.

168.

Since Morales began his employment and Quinn his engagement with Sapheon, Morales, Quinn and Sapheon have engaged in unfair competition with Plaintiffs, by entering into competition with Plaintiffs using Plaintiffs confidential information and/or trade secrets to circumvent the requirements of capital, knowledge, and expertise needed for lawful competition and the costs of entering into the contemplated Supply Agreement between CMPI and Sapheon.

169.

Morales, Quinn, Crawford and Sapheon engaged in the unfair competition described above willfully, maliciously, and with wanton and reckless disregard of the rights of others.

170.

The unfair competition engaged in by Defendants has damaged Plaintiffs in an amount yet to be determined.

**COUNT X**
**(Patent Invalidation)**
**(Against Sapheon)**

171.

Plaintiffs incorporate herein by reference paragraphs 1 through 170 as if fully restated herein.

172.

Sapheon, Inc. is the assignee for United States Patent Application Nos. 20100217313 and 20100217306 (collectively the "Patent Applications"), both filed on August 26, 2010.

173.

Rodney D. Raabe, Jack Chu, Don Crawford, Jan R. Lau, and Zhenyu Zuo are the only listed inventors for Patent Application No. 20100217313.

174.

Rodney D. Raabe, Jack Chu, Don Crawford, Jan R. Lau, and Xiucai Zhang are the only listed inventors for Patent Application No. 20100217306.

175.

The Patent Applications make claims based on CA designed and developed by Morales, Quinn, Joseph Rach and other individuals.

176.

The Patent Applications disclose CA and adhesive information obtained from work done by CMPI pursuant to the Co-Development Agreement and

Plaintiffs' Intellectual Property.

177.

Morales, Quinn, Joseph Rach and other individuals designed and developed the cyanoacrylates mentioned in the Patent Applications while bound by work-for-hire agreements with CMPI or Chemence, which assign to CMPI or Chemence any intellectual property produced by these individuals within the scope of their employment and engagement.

178.

Sapheon and Crawford have withheld listing Morales, Quinn, Joseph Rach and other individuals as inventors on the Patent Applications with intent to deceive the United States Patent and Trademark Office (USPTO).

179.

Sapheon and Crawford have acted with bad faith and/or intentional misconduct by failing to list all of the known inventors of the Patent Applications.

180.

Pursuant to 37 CFR § 1.56, no patent will be granted on an application in connection with which fraud on the USPTO was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct.

181.

Any patent arising from the Patent Applications is invalid and unenforceable.

182.

In the alternative, Sapheon and Crawford must amend the Patent Applications to list Morales, Quinn, Joseph Rach and other individuals as inventors and state CMPI as an assignee and owner.

**COUNT XI**
**(Punitive Damages)**
**(Against all Defendants)**

183.

Plaintiff incorporates herein by reference paragraphs 1 through 182 as if fully restated herein.

184.

The conduct of the Defendants was willful, deliberate, intentional and malicious, with full knowledge of their impropriety and of the harm to Plaintiffs. Plaintiffs are entitled to and should receive a substantial award of punitive or exemplary damages to be determined by the enlightened conscience of the jury.

**COUNT XII**
**(Attorneys' Fees)**
**(Against All Defendants)**

185.

Plaintiff incorporates herein by reference paragraphs 1 through 184 as if fully restated herein.

186.

Defendants have acted in bad faith, have been stubbornly litigious, and have caused Chemence unnecessary trouble and expense.

187.

Pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their expenses of litigation, including attorneys' fees.

WHEREFORE, Plaintiffs request that this Court:

(a)     preliminarily and permanently enjoin Defendants from misappropriating, using, and disclosing Chemence's confidential, proprietary, and trade secret information;

(b)     order Defendants to return all information obtained, by whatever means from Plaintiffs to Plaintiffs;

(c)     award Plaintiffs compensatory and punitive damages as determined by the evidence at trial or by this Court;

(d)     award Plaintiffs treble damages and costs of suit, including reasonable costs for the investigation and litigation pursuant to 18 U.S.C. § 1964(c) and O.C.G.A. § 16-14-6(c);

(e)     award CMPI against Quinn $122,971.84 for the consulting fees

and expenses paid from October 2008 through April 2011;

(f)     Declare Patent Applications No. 20100217313 and

20100217306 as invalid and unenforceable, or in the

alternative, order Sapheon and Crawford to amend the Patent

Applications listing all inventors and state CMPI and/or as an

owner and assignee.

(g)     award Plaintiffs their reasonable costs and attorneys' fees; and

(h)     award Plaintiffs such other and further relief as this Court

deems just and appropriate.

/s/ Robert D. Wilson
Robert D. Wilson
Attorney for Plaintiff
Georgia Bar No. 768891

16716 Chillicothe Road, Suite 100
Chagrin Falls, Ohio 44023-4529
Telephone:  440-708-0445
Facsimile:   440-708-0511
E-mail:  rdwilsonco@gmail.com

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury, in conformity with the provisions of Rule 38(b) of the Federal Rules of Civil Procedure.


/s/ Robert D. Wilson
Robert D. Wilson

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CHEMENCE, INC., AND CHEMENCE MEDICAL PRODUCTS, INC. | : : : : |
|     **Plaintiffs,** | : : |
| **v.** | : **CIVIL ACTION FILE NO.** |
| | : _____ |
| JAMES QUINN, CARLOS MORALES, SAPHEON, INC. a.k.a. SAPHEON THERAPEUTICS, INC., DONALD CRAWFORD and JOHN DOES | : : : : : |
|     **Defendants.** | : |

## <u>VERIFICATION</u>

The undersigned hereby certifies that the factual allegations in the Complaint are true and accurate to the best of my knowledge, information and belief.

Signed and dated at Alpharetta ,Georgia this 28th October 2011.

Chemence, Inc.

_____
By:  Hugh V. Cooke
Its:  President